*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Estate of: ) | |
| ) | Supreme Court No. S-11571 |
| Richard Blodgett, ) | |
| ) | Superior Court No. |
| ROBERT DAVID BLODGETT, ) | 2NO-03-32 PR |
| an interested person, ) | |
| ) | O P I N I O N |
| Appellant, ) | |
| ) | No. 6076 - November 17, 2006 |
| v. ) | |
| ) | |
| LOUANN BLODGETT, ) | |
| Personal Representative, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Nome, Ben Esch, Judge.

Appearances: Verne Rupright, Rupright & Foster, LLC, Wasilla, for Appellant. Joe P. Josephson, Josephson & Associates, PC, Anchorage, for Appellee.

Before: Bryner, Chief Justice, Matthews, Eastaugh, Fabe, and Carpeneti, Justices.

CARPENETI, Justice.
EASTAUGH, Justice, with whom FABE, Justice, joins, concurring.

Attachment 1

## I.    INTRODUCTION

After being convicted of the criminally negligent homicide of his father, Robert Blodgett attempted to obtain the benefits devised to him under his father's will. Pursuant to Alaska's "slayer statute,"[1] the superior court found that Blodgett was not entitled to inherit under the will as a result of his conviction, and that no manifest injustice resulted from this forfeiture. Blodgett attacks this decision on statutory and constitutional grounds. Because we agree with the superior court that Blodgett failed to prove that excluding him from the benefits of his father's will would result in manifest injustice, and because the superior court properly resolved the constitutional issues, we affirm that court's rejection of Blodgett's claims.

## II.    FACTS AND PROCEEDINGS

On September 14, 2003 Robert Blodgett caused the death of his father, Richard Blodgett.[2] Blodgett was indicted for murder in the second degree and in January

---

[1]    AS 13.12.803.

[2]    Blodgett's briefing describes the event as follows: "After jumping onto a dump truck twice in the early morning hours of September 14, 2003, Richard Blodgett apparently became entangled in the dump truck and was dragged to his death. . . . Robert Blodgett was driving the dump truck but was unaware that his father had been killed." Blodgett's testimony in the evidentiary hearing below stated that he generally had a close relationship with his father, and that on the night of the accident when he set the truck in motion he thought all individuals were clear of the truck. Blodgett denied that he had "any indication that somebody might have been in the way or climbing into the truck." He also testified that he did not learn of his father's death until a police officer informed him of the death at some point after his arrest.

Contrary testimony was also adduced at the hearing. Blodgett admitted that he had become involved in two arguments with his father shortly before the homicide, that he and his father were "yelling at each other," and that they had been "toe to toe" before Blodgett was pulled away by another person. Luann Blodgett, the personal representative and Robert Blodgett's sister, testified that "Dad was upset a lot of the time

(continued...)

2004 he entered a plea of no contest to criminally negligent homicide. His conviction led to a three-and-one-half-year term of imprisonment.

Blodgett was named in the final will of his father, which left "all properties, Bank accounts, stocks and insurance policies" to his children. In April 2004 Blodgett petitioned the superior court for a hearing to determine his rights to participate in the probate proceedings under the Alaska probate code and AS 13.12.803. The other will beneficiaries consented to the hearing, but, contending that the killing of Richard Blodgett was not "unintentional," argued that AS 13.12.803 precluded Blodgett from receiving any property under the will.

After additional briefing and a one-day evidentiary hearing, Superior Court Judge Ben Esch issued a Memorandum and Order denying Blodgett's petition and preventing him from obtaining any benefits under the will. The court explained that under AS 13.12.803 forfeiture was mandatory unless the slayer proved by a preponderance of the evidence that this would result in manifest injustice. The court concluded that Blodget failed to make such a showing. The court considered, and rejected, possible factors it thought might colorably result in manifest injustice, including past family relationships and Blodgett's monetary needs. It found the "great deal of testimony about the nature of the past relationship" between Blodgett and his father "unhelpful" and irrelevant in determining "the justice of denying or allowing recovery." It also concluded that Blodgett retained sufficient income earning capacity and property

---

² (...continued)

with [Robert]. He never listened to anything that Dad had told him. He would go out and wreck Dad's vehicles. Other belongings of Dad's. He would trade things off that belonged to Dad for things for himself." Counsel for the personal representative argued in closing that Blodgett "was [not] very interested in his father's safety because of the three different quarrels they had — vicious quarrels, they had to be separated by people — on the very night of this death."

holdings that he "would not be beggared if he did not receive these funds." While the court made no specific findings as to Blodgett's culpability in his father's death, Blodgett was sentenced to three and one-half years in prison after he pled guilty to criminally negligent homicide.

Blodgett appeals.

## III.    STANDARD OF REVIEW

Because the statutory subsection that governs this case provides that the superior court "may" set aside the application of the slayer statute if manifest injustice would result,[3] we review the superior court's decision for abuse of discretion.[4] We find an abuse of discretion "only if, based on a review of the whole record, we are left with a definite and firm conviction that a mistake has been made."[5]

---

[3]    AS 13.12.803(k).

[4]    *Cf. Martinez v. Cape Fox Corp.*, 113 P.3d 1226, 1229 (Alaska 2005) (where statute provided that superior court "may . . . remove" director for fraudulent acts, court's decision is reviewed for abuse of discretion); *Barber v. Barber*, 837 P.2d 714, 716 n.2 (Alaska 1992) ("The approval of a settlement stipulation is within the discretion of the court. Thus, the standard of review is the clear abuse of discretion standard."); *Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570, 572 (Alaska 1969) ("The word 'may' [in Civil Rule 77(f)(2)] makes the imposition of the sanction discretionary with the court. As in other cases where discretionary authority is involved, we shall interfere only where there has been an abuse of discretion.").

[5]    *Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 228 (Alaska 2005). We have also said that we "will interfere with a discretionary determination of the trial court only if it is arbitrary, capricious or manifestly unreasonable." *Safeco Ins. Co. of America v. Honeywell, Inc.*, 639 P.2d 996, 999 (Alaska 1981).

Constitutional challenges to a statute are questions of law.[6] We review such questions *de novo* and will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Concluding That Forfeiture of the Inheritance Would Not Result in Manifest Injustice.

The common law has long followed the policy that "no one should be allowed to profit from his own wrong."[8] Accordingly, many state courts exercised their equitable powers and followed this maxim in construing probate statutes to prevent inheritance by an heir who murdered the decedent.[9] Over the years most states codified this rule into what became known as "slayer statutes."[10]

---

[6]     *Varilek v. City of Houston*, 104 P.3d 849, 851 (Alaska 2004).

[7]     *Id.* at 851-52 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[8]     *See* John W. Wade, *Acquisition of Property by Wrongfully Killing Another - A Statutory Solution*, 49 HARV. L. REV. 715 (1936). This policy was famously described in *Riggs v. Palmer*, 22 N.E. 188 (N.Y. 1889), where the New York Court of Appeals stated:

> No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes.

*Id.* at 190.

[9]     *See, e.g., De Zotell v. Mutual Life Ins. Co.*, 245 N.W. 58, 59 (S.D. 1932); *Riggs*, 22 N.E. at 190-91; Wade, *supra* n.8, at 717-18 n.12.

[10]     Today, forty-five states and the District of Columbia have slayer statutes.
                                                              (continued...)

The original Alaska slayer statute, passed in 1972,[11] applied when the offender "feloniously <u>and intentionally</u> kills" the decedent.[12] The requirement that the homicide be intentional was taken from the common law rule and the Uniform Probate Code's articulation, both of which endorse the policy that a wrongdoer should not profit from his own wrong.[13]

In 1988 the legislature passed an amendment removing the words "and intentionally" from the statute.[14] The amended statute on its face applied to homicides covered in AS 11.41.100 to .140[15] — that is, including criminally negligent homicide. The initial intent of the 1988 amendment was to prevent parents who caused the death of their child — even if unintentionally — from recovering damages through the child's estate.[16] This concern followed a case in which a parent failed to act to bring a child to

---

[10]      (...continued)
*See infra* nn. 32-33. The remaining states have retained some form of the common-law slayer rule. *See* Jeffrey G. Sherman, *Mercy Killing and the Right to Inherit*, 61 U. CIN. L. REV. 803, 805 n.12, 846 n.207 (1993).

[11]      The slayer statute was adopted in that year along with the rest of the UNIFORM PROBATE CODE. *See* ch. 78, § 1, SLA 1972. Until 1996, the slayer statute was located at AS 13.11.305. *See* ch. 75, § 3, SLA 1996.

[12]      Ch. 78, § 1, SLA 1972 (emphasis added).

[13]      *See, e.g., Riggs*, 22 N.E. at 190; UNIF. PROBATE CODE § 2-803(b) & cmt. (Pre-1990 Version), 8 U.L.A. 459-60 (1998) ("The section is confined to felonious and intentional killing and excludes the accidental manslaughter killing.").

[14]      Ch. 164, §§ 3-8, SLA 1988.

[15]      *See* former AS 13.11.305.

[16]      House Health, Educ. and Soc. Servs. Standing Comm. Mins., Senate Bill (S.B.) 320, 15th Leg., 2d Sess., at 384 (April 21, 1988) (Statement of Roxanne Stewart).

the hospital (an act of criminal negligence) resulting in the child's death.[17] During debate on the bill, one representative suggested that the rule apply to all homicides, not just to those perpetrated against children.[18] The final draft of the amendment incorporated this suggestion by simply removing the requirement of intent.

Shortly after this amendment, Alaska Governor Steve Cowper expressed concern that under unusual circumstances, it might be unjust to prohibit a killer from taking the property of the victim, such as in the case of an unintentional felonious killing.[19] Accordingly, another amendment was adopted in 1989,[20] creating the manifest injustice exception for unintentional homicides now found in subsection (k):

> In the case of an unintentional felonious killing, a court may set aside the application of [the slayer statute] if the court makes special findings of fact and conclusions of law that the application of the subsection would result in a manifest injustice and that the subsection should not be applied.[21]

The statute also instructs that acquisitions of property not covered by the section "shall be treated in accordance with the principle that a killer may not profit from the killer's

---

[17]    *Id.* at 625 (Statement of Richard Svobodny).

[18]    *Id.* at 473 (Statement of Rep. Max Gruenberg).

[19]    House Health, Educ. and Soc. Servs. Standing Comm. Mins., Comm. Substitute for House Bill (C.S.H.B.) 165, at 442, 528 (March 14, 1989) (Statement of Rep. Max Gruenberg).

[20]    Ch. 11, § 1, SLA 1990.

[21]    AS 13.12.803(k).

wrong."[22] This has remained the law in Alaska.[23] Thus, the legislature broadened the application of the slayer statute — by extending it to unintentional killings — and created an escape clause — by enacting the manifest injustice exception.[24]

Under the current Alaska criminal code, all unjustified forms of killing are deemed felonies. This includes murder in the first degree,[25] murder in the second

---

[22]    AS 13.12.803(e).

[23]    In 1996 the legislature adopted many provisions of the revised Uniform Probate Code and altered the section numbering, but it left the essential aspects of the slayer statute intact, rejecting (apparently without discussion) the "intentional" requirement of the Uniform Probate Code's slayer statute. Ch. 75, § 3, SLA 1996.

[24]    The current Alaska slayer statute, AS 13.12.803, with the exception relevant in this case, now provides:

> (a) An individual who feloniously kills the decedent forfeits all benefits under this chapter with respect to the decedent's estate, including an intestate share, an elective share, an omitted spouse's or child's share, a homestead allowance, exempt property, and a family allowance. . . .

> (k) In the case of an unintentional felonious killing, a court may set aside the application of (a) . . . of this section if the court makes special findings of fact and conclusions of law that the application of the subsection would result in a manifest injustice and that the subsection should not be applied.

[25]    AS 11.41.100 (unclassified felony).

degree,[26] manslaughter,[27] and criminally negligent homicide.[28]  Thus, Alaska's slayer statute encompasses intentional as well as unintentional homicides.

When compared with the slayer statutes of other jurisdictions, Alaska's slayer statute emerges as unique.  No other state has a manifest injustice provision for unintentional homicides.  But in the great majority of other states, such a provision would be unnecessary — in these states only intentional homicides are within the statutes' reach.[29]  Many of these statutes are modeled after the Uniform Probate Code.  Following the common-law slayer rule, the current Uniform Probate Code slayer statute applies to an "individual who feloniously and intentionally kills the decedent."[30]  The comments clarify that "this section . . . excludes the accidental manslaughter killing."[31]  The

---

[26]    AS 11.41.110 (unclassified felony).

[27]    AS 11.41.120 (class A felony).  A person commits manslaughter if the person "intentionally, knowingly, or recklessly causes the death of another person under circumstances not amounting to murder in the first or second degree."  *Id.*

[28]    AS 11.41.130 (class B felony).  A person commits criminally negligent homicide "if, with criminal negligence, the person causes the death of another person." *Id.*

[29]    The extension of slayer statutes to unintentional homicide was uncommon until fairly recently.  It is now permitted in nine other states and the District of Columbia. *See* Sherman, *supra* n.10, at 848-49, n.213.

[30]    UNIF. PROBATE CODE § 2-803(b) (Revised 1990 Version) (amended 1993), 8 U.L.A. 211 (1998).

[31]    *Id.* § 2-803 cmt., 8 U.L.A. 214.  The comments also state the Article II Drafting Committee's preference for state uniformity in slayer statutes. *Id.*

Restatement (Third) of Property takes a similar position, and its formulation of the law "does not apply if the killing was reckless, accidental, or negligent."[32]

As noted, the great majority of state slayer statutes require that the homicide be intentional.[33] A minority of jurisdictions resemble Alaska in merely requiring the killing to be unlawful, rather than intentional.[34] But even among this minority of jurisdictions, some would only cover homicides with culpable mental states as low as "recklessness,"[35] and at least one has followed a judicial opinion reading an

---

[42]    RESTATEMENT (THIRD) OF PROP.: WILLS & OTHER DONATIVE TRANSFERS § 8.4 & cmt. f (2003).

[33]    See, e.g., ARIZ. REV. STAT. ANN. § 14-2803 (2005); CAL. PROB. CODE § 250 (West 2005); WASH. REV. CODE ANN. § 11.84.010 –.020 (2005). See generally Sherman, supra n.10, at 848-49.

[34]    See, e.g., COLO. REV. STAT. § 15-11-803 (2005); DEL. CODE. ANN. tit. 12, § 2322 (2005); OR. REV. STAT. § 112.455–.465 (2005).

[35]    For example, Colorado's slayer statute covers the crimes of "murder in the first or second degree or manslaughter," but omits reference to criminally negligent homicides. See COLO. REV. STAT. § 15-11-803 (slayer statute), § 18-3-105 (criminally negligent homicide). Manslaughter in Colorado is generally a killing caused recklessly. Id. § 18-3-104. Delaware follows a similar scheme. See DEL. CODE ANN. tit. 12, § 2322 (including reckless manslaughter within its reach, but excluding criminally negligent homicide). The slayer statutes or common law slayer rules from several states and the District of Columbia do, however, apply to all felonious killings. See KY. REV. STAT. ANN. § 381.280 (West 2006) (covering a person who "takes the life of the decedent and is convicted therefor of a felony"); LA. REV. STAT. ANN. § 22.613 (2005) (applying to persons "criminally responsible for the death" of the decedent), Quick v. United Ben. Life Ins. Co., 213 S.E.2d 563, 570-71 (N.C. 1975) (applying common law slayer rule where "culpable negligence" was shown); and D.C. CODE § 19-320 (2005) (covering all felonious homicides). Another type of jurisdiction in the minority is Kansas, which includes all felonious killings within its slayer statute, KAN. PROB. CODE § 59-513 (2004), but its criminal code does not recognize any sub-reckless homicides as felonies. Compare KAN. STAT. § 21-3404 (involuntary and reckless homicide is felony) with
(continued...)

intent requirement into its slayer statute.[36] Thus, when compared to the practices of most other jurisdictions, Alaska's slayer statute has a much broader reach that would preclude inheritance for unintentional killers where other jurisdictions would not.

The legislature tempered the broad reach of AS 13.12.803 by investing trial courts with discretion to stay its application in those cases where manifest injustice would result. Should inheritance be denied to the unskilled teenager who drives his car in a criminally negligent manner and accidentally causes the death of a sole remaining parent? The legislature clearly decided that in such a case there should be discretion in the court to consider the specific facts of the homicide and, if denial of inheritance would be manifestly unjust, to permit it. Nor does this power to avoid the rule conflict with the policy underlying the slayer rule: that a killer should not profit from the killer's own wrong.[37] Where the killer's act was not intentional, and especially where the act was not even reckless, and where other circumstances mitigate the crime, the application of this principle may lead to unduly harsh results. Indeed, the unintended killing of a loved one, as in the example above, would likely cause the inadvertent killer far greater personal ruin than monetary gain.

---

[35]    (...continued)
KAN. STAT. § 21-3405 (vehicular homicide, based on negligence, is misdemeanor). In addition, New York, which does not have a slayer statute but which applies the common law rule, extends the rule to reckless but unintentional killings (second degree manslaughter). *In re Wells' Will*, 350 N.Y.S.2d 114, 119 (N.Y. Sur. 1973).

[36]    *Dowdell v. Bell*, 477 P.2d 170, 172-73 (Wyo. 1970).

[37]    "A wrongful acquisition of property or interest by a killer not covered by this section shall be treated in accordance with the principle that a killer may not profit from the killer's wrong." AS 13.12.803(e).

**6076**

In this case, Blodgett was convicted of criminally negligent homicide after a plea of no contest. This conviction conclusively established a felonious killing under the slayer statute.[38] Because a criminally negligent homicide is an unintentional homicide, under subsection (k) Blodgett is entitled to avoid the effects of the slayer statute if he proves by a preponderance of the evidence that applying the statute to him will result in manifest injustice.

We have not had occasion to define the phrase "manifest injustice" as used in the slayer statute, or to set out the relevant factors that a trial judge should consider when ruling on this question. Similarly, because no other state slayer statute contains a provision similar to subsection (k), out-of-jurisdiction case law provides no ready assistance. However, the Alaska Court of Appeals has interpreted this phrase in another, similar context. In criminal presumptive sentencing, the legislature enacted a "safety valve" provision that permits review of a sentence by a special three-judge panel upon a showing of manifest injustice.[39] In *Smith v. State*,[40] the court of appeals equated manifest injustice with that which is "plainly unfair."[41] Later, in *Beltz v. State*,[42] the court of appeals held that a presumptive term cannot be manifestly unjust "in general" but only

---

[38]     AS 13.12.803(f) ("[A] judgment of conviction establishing criminal accountability for the felonious killing of the decedent conclusively establishes the convicted individual as the decedent's killer for the purposes of this section.").

[39]     AS 12.55.165 and .175.

[40]     711 P.2d 561 (Alaska App. 1985).

[41]     *Id.* at 570

[42]     980 P.2d 474 (Alaska App. 1999).

"as applied to a particular defendant."[43]  Before finding manifest injustice, the court held that the "judge must articulate specific circumstances that make the defendant significantly different from a typical offender within that category or that make the defendant's conduct significantly different from a typical offense."[44]  We adopt *Beltz*'s approach for the purpose of applying subsection (k) of Alaska's slayer statute.

Thus, the relevant comparison here is between Blodgett's conduct and that of a typical offender convicted of negligent homicide.  In the criminal proceedings, Blodgett was sentenced to three and one-half years in prison.  This sentence approaches the presumptive term for second felony offenses, suggesting that the superior court did not believe Blodgett's acts fell at the lowest level of culpability for a negligent homicide.[45]  Given the length of the sentence, we are reassured that the court below considered Blodgett's conduct in relation to other similarly situated defendants when it rejected Blodgett's claim of manifest injustice.

Blodgett attempted to prove that enforcement of the slayer statute would result in manifest injustice by introducing evidence regarding (1) past family relationships, and (2) possible impecunity if denied the benefits of inheritance.  The court found that Blodgett failed to meet his burden of proving, by a preponderance of the evidence, extraordinary circumstances that would have made it manifestly unjust to exclude him from his father's will.  We agree.

---

[43]     *Id.* at 480.

[44]     *Id.*

[45]     Criminally negligent homicide is a class B felony.  AS 11.41.130(b).  A defendant convicted of a class B felony may be sentenced to a definite term of not more than ten years, and shall be sentenced to a presumptive term of four years if the offense is a second felony conviction.  AS 12.55.125(d)(1).

The court described the evidence regarding family relationships as "unhelpful." While the court's statement that the "nature and quality of the relationship between these parties during life seem unrelated to the fairness of allowing the killer to benefit after the decedent's death" may be a narrow interpretation of the relevance of past relationships generally, we do not believe it was an abuse of discretion under the circumstances of this case. Witnesses testified that Blodgett and his father shared a relationship of "tough love," a "good relationship" marked with occasional "squabblings" typical of father-son relationships. Such testimony neither proves nor refutes the fairness of forfeiting Blodgett's inheritance. The court did not abuse its discretion in deciding that Blodgett failed to prove manifest injustice on this ground.

The court also examined Blodgett's argument that "it would be unjust to deny benefits under the will to someone who is physically disabled, who faces unknowable future medical expenses, who has a compromised earning capacity and has ongoing psychological needs." The superior court noted that, although Blodgett suffered some medical disabilities, Blodgett's own witness testified that he "is adept at the operation of heavy equipment and has skills as a mechanic." The court found that these skills could lead to employment with yearly compensation ranging between $40,000 and $50,000 per year. It also found that Blodgett owns other property and that future medical expenses will likely be met through the Alaska Native Health Service. In light of this testimony, the court concluded that Blodgett "would not be beggared if he did not receive these funds." Consequently, the court found that Blodgett failed to prove manifest injustice based on monetary need.

While we believe the court did not abuse its discretion in making this determination, we are concerned that the court's analysis could lead to the conclusion that a showing of manifest injustice may turn on predictions concerning the future

-14-                                                            6076

financial health of the petitioner. Such an approach would allow slayers of their decedents to inherit if they are poor, but not if they are financially solvent. We doubt that this distinction — between different slayers based on their personal wealth — reflects the legislature's purpose in enacting the manifest injustice provision.[46]

Despite these concerns, we conclude that the superior court did not abuse its discretion in finding that Blodgett failed to prove manifest injustice by a preponderance of the evidence.

## B.   Application of the Slayer Statute Did Not Violate Blodgett's Constitutional Rights.

Blodgett argues that the slayer statute violates several of his constitutional rights, including his right to due process, his right to avoid "forfeiture of estate," and his rights under the ex post facto clause.[47]  We consider each in turn.

---

[46]   As noted, the manifest injustice provision of subsection (k) was added after the governor expressed concern that under certain unusual circumstances, it may be an injustice to prohibit the killer from taking property of the victim, such as in the case of an unintentional felonious killing. House Health, Educ. and Soc. Servs. Standing Comm. Mins., C.S.H.B. 165, at 442 (March 14, 1989) (Statement of Rep. Gruenberg) (emphasis added).

[47]   In his opening brief on appeal, Blodgett also attempted to raise the claim that application of the slayer statute violated his right to equal protection. His failure to raise this claim before the superior court waived it. Willoya v. State, Dep't of Corrs., 53 P.3d 1115, 1120 (Alaska 2002) (holding that argument is waived if raised for first time on appeal); Brandon v. Corrs. Corp. of America, 28 P.3d 269, 280 (Alaska 2001) (same). In his reply brief on appeal, Blodgett attempted to argue that his constitutional right to jury trial and his constitutional right to protection against double jeopardy were violated. But we will not consider arguments raised for the first time in a reply brief. Danco Exploration, Inc. v. State, Dep't of Natural Res., 924 P.2d 432, 435 n.1 (Alaska 1996). Accordingly, we decline to consider any of these constitutional claims.

1.    **Due process**

Blodgett argues that the superior court's application of the slayer statute violated his due process rights protected by article 1, section 7 of the Alaska Constitution.[48]  Due process requires that a party receive adequate notice and an opportunity to be heard before being deprived of life, liberty, or property by adjudication.[49]  Blodgett argues that "[a]t present, nothing is protecting Robert Blodgett's due process right to obtain access to the court, access to discovery and receive a fair hearing."

Blodgett requested and obtained a hearing with the superior court. He then filed advance briefing and presented evidence and arguments in front of a judge. These procedures would appear to dispose of any due process argument. Blodgett's position, however, is centered on the assertion that he held *de facto* partnership or joint venture interests in his father's business. He argues that his due process rights were violated by not having an opportunity to present evidence regarding these alleged interests.

There are numerous problems with this due process argument.  First, Blodgett <u>had</u> a hearing in front of the superior court and failed to present <u>any</u> evidence regarding these alleged partnership or joint venture interests.  Second, Blodgett's assertion on appeal regarding these interests appears entirely unsupported; he points to no evidence in the record to support it.  In fact, what little evidence there is in this case suggests otherwise –– a letter from Blodgett to his sister after his father's death suggests

---

[48]    Alaska Constitution article 1, section 7 provides: "No person shall be deprived of life, liberty, or property, without due process of law. . . ."

[49]    *Aguchak v. Montgomery Ward Co.*, 520 P.2d 1352, 1356 (Alaska 1974) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

that Blodgett did not have any partnership interest in the father's business.[50]  Finally, even if Blodgett has a tenable argument for a partnership interest, it is not clear that the slayer statute would cause him to forfeit his <u>own</u> share of the partnership.  For these reasons, we reject Blodgett's due process argument.

### 2.    "Forfeiture of estate"

Blodgett next contends that the application of the slayer statute resulted in a "forfeiture of estate" in violation of article I, section 15 of the Alaska Constitution. That section provides:

> **Prohibited State Action.**  No bill of attainder or ex post facto law shall be passed.  No law impairing the obligation of contracts, and no law making any irrevocable grant of special privileges or immunities shall be passed.  <u>No conviction shall work corruption of blood or forfeiture of estate</u>.

(Emphasis added.)  These provisions respond to certain practices and doctrines inherited from England.[51]  Attainder existed at common law; it was "the act of extinguishing a person's civil rights when that person is sentenced to death or declared an outlaw for committing a felony or treason."[52]  Incident to attainder and as punishment for the crime, the felon forfeited all of his lands and chattels to the state.[53]

We affirm the superior court's rejection of Blodgett's "forfeiture of estate" claim on both procedural and substantive grounds.  Procedurally, Blodgett waived his

---

[50]    In that letter, Blodgett stated, "And I really want to help and participate in the family business."

[51]    *See generally* Mary Louise Fellows, *The Slayer Rule: Not Solely a Matter of Equity*, 71 IOWA L. REV. 489, 539-40 (1986).

[52]    BLACK'S LAW DICTIONARY 137 (8th ed. 2004).

[53]    Fellows, *supra* n.49, at 539.

argument by inadequately briefing the issue. In his brief he alleged that the "slayer statute ... works a forfeiture" and cited article I, section 15 of the Alaska Constitution, but he did not construct any argument as to why that section should invalidate Alaska's slayer statute.[54] Substantively, the law is clear — and many states have held — that the "forfeiture of estate" clause is not implicated by the slayer rule.[55] Several rationales support this conclusion. First, any loss caused by a slayer statute is not improperly based on attainders or on the legal status of a felon; rather, the slayer statute exists to effectuate the accepted policy that a killer should not profit from his wrong.[56] The rule does not prevent the slayer from inheriting in general; it only prevents the slayer from inheriting from the slayer's victim. Second, courts have noted that the application of the slayer rule does not actually cause a forfeiture, because the offender did not own the property at the time of the homicide; he merely had an expectancy interest.[57] By killing the decedent, the slayer prevents the property interest from vesting in himself.[58] Third, the

---

[54]    *Brandon v. Corrs. Corp. of America*, 28 P.3d 269, 280 (Alaska 2001) ("[C]ursory treatment of an issue is considered by this court to be waiver of that issue.").

[55]    *E.g., Hamblin v. Marchant*, 175 P. 678, 679 (Kan. 1918); *Cook v. Grierson*, 845 A.2d 1231, 1234 (Md. 2004); *Garwols v. Bankers Trust Co.*, 232 N.W. 239, 241 (Mich. 1930); *Legette v. Smith*, 85 S.E.2d 576, 580 (S.C. 1955). For more examples, *see* Michael G. Walsh, *Homicide as Precluding Taking Under Will or By Intestacy*, 25 A.L.R.4th 787, §§ 4, 15 (2004).

[56]    Fellows, *supra* n.49, at 544 & n.168 (collecting cases).

[57]    *Id.* at 540 & n.160 (collecting cases).

[58]    This rationale accounts for those cases which have used the forfeiture of estate clause to strike down aspects of slayer rules. There have been findings of unconstitutionality in primarily two areas. The first area — not relevant here — involves since-superseded cases using the constitutional provision to reject requests for the judicial creation of a common-law slayer rule. *See, e.g., Hagan v. Cone*, 94 S.E. 602,
(continued...)

-18-                                      6076

constitutional language suggests that it covers complete forfeiture, but even assuming that something is forfeited as the result of application of the slayer statute, it is not the entire estate, but merely "some" property.[59] Finally, the slayer statute differs from the effect of attainder in that it generally results in the estate going to the other heirs, not to the government.[60] Because the "forfeiture of estate" clause is clearly inapplicable, Blodgett's argument here must fail.

### 3. *Ex post facto* clause

Blodgett next argues that application of the slayer statute violated the *ex post facto* clause of the same constitutional provision.[61] An *ex post facto* law is a law "passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed."[62] It is unclear whether

---

[58]    (...continued)

603-4 (Ga. 1917), *overruled by statute as noted in Keith v. Johnson*, 440 S.E.2d 230, 232-33 (Ga. App. 1993); *Wall v. Pfanschmidt*, 106 N.E. 785, 789-90 (Ill. 1914), *overruled by statute as noted in In re Estate of Vallerius*, 629 N.E.2d 1185, 1188 (Ill. App. 1994). The second area involves the narrow question of whether a murderous spouse forfeits all title to his marital joint tenancies. *Compare Neiman v. Hurff*, 93 A.2d 345, 348 (N.J. 1952) (divesting surviving-murderer spouse of legal title to joint property would violate constitution, but placing legal title of victim's share in constructive trust would circumvent constitutional problems) *with In re King's Estate*, 52 N.W.2d 885, 887-88 (Wis. 1952) (divesting surviving-murderer spouse of entire tenancy presents no constitutional infirmity). This issue — while irrelevant to this case — is addressed directly in Alaska's slayer statute. *See* AS 13.12.803(b)(2) (felonious killing severs joint tenancy with right of survivorship into tenancies in common).

[59]    Fellows, *supra* n.49, at 543 & n.167 (collecting cases).

[60]    *Id.* at 540-41 & n.161.

[61]    *See* ALASKA CONST., art. I, § 15.

[62]    *Danks v. State*, 619 P.2d 720, 722 n.3 (Alaska 1980) (citing BLACK'S LAW
                                                                              (continued...)

the *ex post facto* clause applies to purely civil statutes.[63]  However, because the slayer statute is arguably punitive, there is at least a plausible argument that it could apply in this scenario.

But Blodgett cannot prevail on such an argument, because his claim concerns a non-probate asset: his father's life insurance policy.  Shortly after Blodgett's plea, the New York Life Insurance Company sent Blodgett a letter stating that the Alaska slayer statute disqualified him from obtaining any benefits under the life insurance policy, executed in 1985.  Blodgett's position is that his rights under this insurance contract were impaired retrospectively by the subsequent passage of the slayer statute. We need not reach this argument, for there has been no adjudication with regard to the life insurance policy.

Life insurance policies are non-probate transfers.[64]  Thus, that Blodgett has been excluded from probate under a slayer statute does not necessarily exclude him from obtaining life insurance benefits.[65]  Blodgett has not sued the New York Life Insurance

---

[62]    (...continued)
DICTIONARY 520 (5th ed. 1979)).

[63]    *Compare Allen v. State*, 945 P.2d 1233, 1237 (Alaska App. 1997) ("[T]he *ex post facto* clause prohibits the retrospective application of laws that 'alter the definition of crimes or increase the punishment for criminal acts.' ") (citing *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)) *with Underwood v. State*, 881 P.2d 322, 327-28 (Alaska 1994) (analysis by court implies that *ex post facto* clause could apply to civil statute).  Retroactive civil legislation must include an express statement of retroactivity within the statute.  AS 01.10.090.

[64]    AS 13.33.101.

[65]    The superior court noted that these benefits "would not be subject to the [slayer] statute."  Blodgett's own briefing recognizes that "the trial court did not directly disqualify Robert from receiving the benefits of his contractual interest in the life (continued...)

Company to challenge its decision to disqualify him. Without such a challenge, whether the slayer statute applies to non-probate transfers was not before the superior court — as that court recognized — nor is it before us. Accordingly, there is no occasion for us to consider whether such an application would violate the *ex post facto* clause.

## V.    CONCLUSION

Because the superior court did not abuse its discretion in concluding that manifest injustice would not result from application of the slayer statute, and because Blodgett's constitutional challenges to the slayer statute are unavailing, we AFFIRM the decision of the superior court.

---

[65]    (...continued)
insurance policy."

EASTAUGH, Justice, with whom FABE, Justice, joins, concurring.

I agree with the result the court reaches, but write separately to discuss my concern about how our slayer statute, AS 13.12.803, applies to negligent homicide.[1]

Many states have equivalent statutes, but most prevent inheritance only if the heir intentionally causes the decedent's death.[2] Only about ten states by statute or common law forbid someone who unintentionally causes the death of another from inheriting the decedent's estate,[3] and most of these states disinherit only for reckless conduct and not for negligent homicide.[4] Other than Alaska, no more than four states and

---

[1]     Per AS 11.41.130 "[a] person commits the crime of criminally negligent homicide if, with criminal negligence, the person causes the death of another person." Per AS 11.81.900(a)(4) a person acts with criminal negligence "when the person fails to perceive a substantial and unjustifiable risk . . . of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

[2]     See Slip Op. at 10.

[3]     Jeffrey G. Sherman, *Mercy Killing and the Right to Inherit*, 61 U. CIN. L. REV. 803, 848 n.213 (1993).

[4]     See COLO. REV. STAT. §§ 15-11-803 & 18-3-04 (extending slayer statute to killers who recklessly cause death of others); DEL. CODE ANN. tit. 12 § 2322 & tit. 11 § 632 (extending slayer statute to killers who recklessly cause the death of another); *In re Wells' Will*, 350 N.Y.S.2d 114, 119 (N.Y. Sur. 1973) (noting that "[t]here is a tremendous difference between one who is criminally negligent but nevertheless guilty of unintentional manslaughter from one guilty of manslaughter in the second degree for recklessly causing the death of another"); 84 OKLA. ST. ANN. § 231 & 21 OKLA. ST. ANN. § 711 (extending slayer statute to involuntary manslaughter); OR. REV. STAT. § 112.455 (extending slayer statute to those who kill with "felonious intent," which would appear to cover reckless, but not negligent, homicide); *In re Klein's Estate*, 378 A.2d 1182, 1186 (Pa. 1977) (holding that involuntary manslaughter bars inheritance when the culpability is reckless, but not if negligent); *McClure v. McClure*, 403 S.E.2d 197, 200 n.6 (W. Va. 1991) (holding that despite statute declaring anyone who feloniously kills
(continued...)

-22-                                                                      6076

the District of Columbia appear to disinherit if the wrongful conduct that causes the death is merely negligent in some degree.[5]

---

[4]    (...continued)
another could not inherit, nonetheless "death resulting from negligence or gross negligence will not bar recovery under a slayer statute").

[5]    The District of Columbia slayer statute covers homicide resulting from grossly negligent conduct. *See Turner v. Travelers Ins. Co.*, 487 A.2d 614, 615 (D.C. 1985) (explaining that the slayer statute covers "unintentional killing derived from reckless or grossly negligent conduct").

Louisiana's slayer statute covers all criminal homicide. *In re Hamilton*, 446 So. 2d 463, 465 (La. App. 1984) (holding that slayer statute "was intended to include situations such as that presented by this case, where a beneficiary does not intentionally and feloniously cause the death of the insured but is nonetheless held criminally responsible for that death").

North Carolina's common law slayer rule prohibits inheritance after any wrongful homicide. *Quick v. United Benefit Life Ins. Co.*, 213 S.E.2d 563, 567 (N.C. 1975); *Matter of Estate of Cox*, 388 S.E.2d 199, 201 (N.C. App. 1990). The continued application of this common law rule has been criticized in light of a slayer statute barring only intentional killers from inheriting. N.C. GEN. STAT. § 31A-3; *see also generally* Julie Waller Hampton, *The Need for a New Slayer Statute in North Carolina*, 24 CAMPBELL L. REV. 295 (2002).

Kentucky Revised Statute § 381.280 bars inheritance from those convicted of any felonious homicide. "Reckless homicide" is a felony. KRS § 507.050. Kentucky defines "reckless" as "a gross deviation from the standard of conduct that a reasonable person would observe." KRS § 501.020. Reckless homicide in Kentucky is therefore equivalent to criminal negligence in Alaska under AS 11.81.900(a)(4).

Kansas Statute § 59-513 states that "[n]o person convicted of feloniously killing, or procuring the killing of, another person shall inherit." Involuntary homicide under Kansas law extends to "killing of a human being" committed recklessly, during a misdemeanor, or "during the commission of a lawful act in an unlawful manner." KS ST § 59-513. This arguably could extend to grossly negligent conduct, especially as KS ST § 21-3201 explains that "[t]he terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'wantonness' are included within the term 'recklessness' as used in this
(continued...)

Our statute is unusual because it potentially applies to a class of events that are predictably more likely to occur (because they involve negligence). It is also unusual because the wrongful conduct that puts family members at risk may be relatively mainstream, akin to what much of the populace commonly does. This is especially so if it involves common activities (such as driving motor vehicles) that often violate the standard of care specified by statute or regulation.[6] As a result, our statute potentially applies both broadly and frequently. There is a potential for harsh results not necessarily contemplated by the drafters.

There is also a risk that the state's interests advanced by the statute are too marginal to justify interference with the testamentary expectations of the victim of negligence. But Blodgett has not challenged the statute's constitutionality. I therefore assume here that the state has sufficient interest in deterrence and public safety to bar inheritance even for negligent homicide. There is nonetheless a potential for injustice if the statute is applied harshly in a particular case.

---

[5]    (...continued)
code." A federal district court has held that Kansas's slayer statute does not apply to negligent homicide, and there appear to be no state cases interpreting the scope of the statute or applying it to negligent homicide. *Rosenberger v. Nw. Mut. Life Ins. Co.*, 176 F. Supp. 379, 382-83 (D. Kan. 1959) (explaining that "the intent of the legislature in enacting the statute must have been to give effect to the common-law rule"). The Kansas slayer statute is essentially unchanged since *Rosenberger.*

[6]    A driver who breaches a standard of care set by traffic statutes and regulations is negligent. *See, e.g., Ardinger v. Hummell*, 982 P.2d 727, 734 (Alaska 1999) (explaining that one "who indisputably violates a statue must be found to be negligent"). If there is a gross deviation from the standard of care that a reasonable person would observe the conduct could rise to the level of criminal negligence. *See Comeau v. State*, 758 P.2d 108, 114 (Alaska App. 1988) (noting that driving while impaired by alcohol could constitute criminal negligence).

Our statute since 1989 has contained an exception for "manifest injustice."[7] The legislature, concerned about the possible injustice of applying the slayer statute to unintentional homicides, in that year adopted an escape clause that permits a court to avoid fortfeiture if it "makes special findings of fact and conclusions of law" that manifest injustice would result.[8]

But because the statute necessarily applies to negligent homicide, trial courts might mistakenly assume that circumstances involving mainstream conduct well within the statute (such as negligent homicide arising out of operation of a vehicle) cannot provide a basis for finding manifest injustice. A court might likewise think circumstances bearing on the conduct itself cannot be relevant to a manifest injustice inquiry. In my view, such a cramped interpretation of the manifest injustice standard could result in substantial unfairness in many cases. Indeed, the very frequency with which negligently operated vehicles cause death might lead some trial courts to think the circumstances of how a vehicle was operated can never demonstrate manifest injustice. At the least, a court might apply a presumption against finding manifest injustice.

The statute does not explain what circumstances might justify a finding of manifest injustice. It would seem that a litigant trying to avoid disinheritance under the slayer statute should be permitted to present any arguably relevant evidence. This would include evidence relevant to the gravity of the negligent conduct or to the beneficiary's relationship with the decedent. Foreign jurisdictions whose slayer statutes also contain escape clauses permit consideration of a broad range of circumstances. The English Forfeiture Act states: "The court shall not make an order under this section modifying

---

[7]     AS 13.12.803(k); *see also* Slip Op. at 6-8.

[8]     *See* Slip Op. at 6-8 (discussing legislative history).

the effect of the forfeiture rule in any case unless it is satisfied that, having regard to the conduct of the offender and of the deceased and to such other circumstances as appear to the court to be material, the justice of the case requires the effect of the rule to be so modified in that case."[9]    One of the leading English cases considering what circumstances might be relevant has explained:

> The court is entitled to take into account a whole range of circumstances relevant to the discretion, quite apart from the conduct of the offender and the deceased: the relationship between them; the degree of moral culpability for what has happened; the nature and gravity of the offense; the intentions of the deceased; the size of the estate and the value of the property in dispute; the financial position of the offender; and the moral claims and wishes of those who would be entitled to take the property on the application of the forfeiture rule.[10]

It would also seem that if a beneficiary requests findings on circumstances that are arguably relevant to manifest injustice, the trial court should make findings as to each relevant circumstance and explain which circumstances the court concludes are irrelevant. But Blodgett does not claim here that the trial court's findings were inadequate. Although the trial court addressed only one circumstance — the financial effect of disinheritance on Blodgett — there was no request for findings as to any other circumstance and there is no claim on appeal that the superior court's findings were deficient.

I therefore agree to affirm.

---

[9]    Forfeiture Act, 1982, c. 2 § 1 (Eng.).

[10]    *Dunbar v. Plant*, [1998] Ch. 412, 427–28 (appeal taken from Chancery Division) (U.K.) (holding that survivor of husband-wife suicide pact could inherit her husband's estate).